IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-377

Filed 18 February 2026

North Carolina Industrial Commission, I.C. No. TA-28836

CAMILLE BRYANT, Administrator of the Estate of James R. Baggott, Plaintiff,

v.

NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Appeal by plaintiff from order entered 18 November 2024 by the Full Commission of the North Carolina Industrial Commission. Heard in the Court of Appeals 19 November 2025.

> *Ferikes Bleynat & Cannon, PLLC, by Edward L. Bleynat, Jr., for plaintiff-appellant.*
>
> *Attorney General Jeff Jackson, by Deputy Solicitor General James W. Doggett and Solicitor General Fellow Katharine Devan Daly, for defendant-appellee.*
>
> *North Carolina Sheriffs' Association, by Executive Vice President and General Counsel Edmond W. Caldwell, Jr., Associate General Counsel Jesse M. Gutstein, and Fred P. Baggett, for the North Carolina Sheriffs' Association, amicus curiae.*

FLOOD, Judge.

Plaintiff Camille Bryant, as Administrator of the Estate of James R. Baggott, appeals from the North Carolina Industrial Commission's (the "Full Commission") order dismissing Plaintiff's wrongful death claim made under the Tort Claims Act. On appeal, Plaintiff argues the Full Commission erred, first, by finding her claim was barred by sovereign immunity, and second, by failing to award summary judgment

in Plaintiff's favor. After careful review, we conclude the Full Commission properly granted summary judgment for Defendant North Carolina Department of Health and Human Services ("NCDHHS") with respect to Plaintiff's claim under the Tort Claims Act, where Plaintiff's claim was barred by sovereign immunity. We, therefore, affirm the Full Commission's order.

## I. **Factual and Procedural Background**

On 1 September 2020, Plaintiff filed an affidavit of claim under the Tort Claims Act against NCDHHS, Macon County Sheriff's Office ("MCSD"), and Macon County Sheriff's Office Deputy Cody Mitchell ("Deputy Mitchell") in the North Carolina Industrial Commission, seeking damages for the wrongful death of her husband, James R. Baggott, as a result of an automobile accident that occurred on 12 February 2019. In her affidavit, Plaintiff described the 12 February 2019 accident in detail:

> [Mr.] Baggott . . . was under the care, custody[,] and control of the State of North Carolina and NCDHHS by and through an involuntary commitment proceeding and order issued by the Magistrate, Macon County, North Carolina in February 2019. . . . On 12 February 2019, Mr. Baggott was discharged from the behavioral treatment facility located in Winston-Salem, North Carolina, and was being transported back to Macon County in a van operated by Deputy . . . Mitchell. While traveling down US Hwy 64 in Macon County, Deputy Mitchell drove the transport van, then having inadequate treaded tires, at an excessive speed at or over 80 m.p.h. during inclement weather and lost control of the vehicle while entering a curve with an upslope. As a result, . . . Deputy Mitchell lost control of the van, hydroplaned off of the roadway, and flipped the van multiple times. Mr. Baggott, who was locked in the rear of the van, was violently tossed about the rear of the van

> striking his head and body upon the metal interior and was severely injured. Mr. Baggott was transported from the scene to Mission Hospital in Ashville [sic] but died from his injuries.

Plaintiff alleged that "[t]he negligent conduct in failing to ensure the transportation van was adequately equipped with sufficiently treaded tries and the negligent conduct of the transportation agent, Deputy Mitchell, acting on behalf of the State and NCDHHS, proximately caused the wrongful death of Mr. Baggott."

In response to Plaintiff's affidavit, on 30 October 2020, MCSD moved to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted, arguing that MCSD "is not a State department, institution, or agency as required by the Tort Claims Act." Deputy Commissioner David Mark Hullender granted MCSD's motion and dismissed Plaintiff's claims against MCSD and Deputy Mitchell with prejudice. Deputy Commissioner Hullender later amended this order to clarify that nothing in the order prevents "Plaintiff from pursuing any claims against the dismissed parties in a proper jurisdiction under North Carolina law."[1]

NCDHHS also moved to dismiss Plaintiff's claim; however, the motion was denied. NCDHHS appealed to the Full Commission, which determined the allegations in Plaintiff's affidavit regarding an agency relationship between

---

[1] Plaintiff did not appeal Deputy Commissioner Hullender's order dismissing MCSD and Deputy Mitchell as parties to the action to the Full Commission. Rather, the Record on appeal indicates Plaintiff filed a Complaint in Macon County Superior Court against the County of Macon; MCSD; John B. Holbrooks, in his capacity as Macon County Sheriff; Deputy Mitchell, individually and in his capacity as Macon County Deputy Sheriff; and Western Surety Company, as Surety.

NCDHHS and Deputy Mitchell were sufficient for Plaintiff's claim to proceed to discovery and thus affirmed the deputy commissioner's order.

After discovery, NCDHHS moved for summary judgment, arguing "the [S]tate's sovereign immunity remains intact against [Plaintiff's] claim[]" as "no agent of [NCDHHS] was involved in [Mr.] Baggott's transportation home on" 12 February 2019, and Plaintiff cannot show that NCDHHS owed Mr. Baggott a duty as a matter of law. On 18 March 2024, Deputy Commissioner Hullender entered an order granting NCDHHS's motion for summary judgment for two reasons: first, "the State's sovereign immunity is not waived by the Tort Claims Act in this claim, because the county official[s] were not agents of NCDHHS[,]" and second, NCDHHS "owed [P]laintiff no duty as a matter of law[.]" Deputy Commissioner Hullender subsequently dismissed Plaintiff's claim. Plaintiff appealed this order to the Full Commission.

Following a hearing, the Full Commission entered an order granting NCDHHS's motion for summary judgment, dismissing Plaintiff's claim with prejudice, and taxing costs to Plaintiff. In granting NCDHHS's motion for summary judgment, the Full Commission found and concluded that, "[i]n the light most favorable to Plaintiff, as the non-moving party," NCDHHS showed there was no genuine issue of material fact. In determining Plaintiff failed to produce evidence that can establish a *prima facie* case of a negligence claim under the Tort Claims Act, the Full Commission found the following:

[NCDHHS] has shown that Plaintiff failed to identify an agent or employee of [] NCDHHS whose alleged negligent conduct would subject [] NCDHHS to liability under the Tort Claims Act. Moreover, [] NCDHHS has shown that the only named negligent actors, Deputy Mitchell and MCSD, were not agents or employees of [] NCDHHS on 12 February 2019. Moreover, assuming arguendo that Plaintiff had properly named an agent or employee of [] NCDHHS as a negligent actor, Plaintiff has also failed to identify any duty owed by [] NCDHHS to Mr. Baggot[t] during his transportation on 12 February 2019 or how any such duty was breached by an employee or agent of [] NCDHHS.

Plaintiff timely filed her notice of appeal to this Court.

## II. <u>Jurisdiction</u>

This Court has jurisdiction to hear an appeal from any final order of the Full Commission pursuant to N.C.G.S. §§ 7A-29 and 143-293 (2023).

## III. <u>Standard of Review</u>

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *In re Will of Jones*, 362 N.C. 569, 573 (2008) (quoting *Forbis v. Neal*, 361 N.C. 519, 524 (2007)).

## IV. <u>Analysis</u>

On appeal, Plaintiff argues that sovereign immunity does not apply in this case, and the Full Commission erred by granting NCDHHS's motion for summary judgment and dismissing her claim based on this defense. Specifically, Plaintiff

claims NCDHHS waived its sovereign immunity and is vicariously liable as principal for Deputy Mitchell's negligent acts under the Tort Claims Act because he was acting as an agent of NCDHHS at the time of the fatal accident. To support her claim, Plaintiff advances two theories of agency: (A) under the Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985 (the "Mental Health Act"), NCDHHS has "far reaching control" over the local officials who act as agents to "implement the statutory and regulatory regime[;]" and (B) NCDHHS had a nondelegable duty to transport involuntarily committed individuals.

## A. The Mental Health Act

Plaintiff first contends NCDHHS waived its sovereign immunity and is vicariously liable for Deputy Mitchell's negligence under the Tort Claims Act because "[c]ounties and law enforcement officers act" as agents of NCDHHS "when transporting involuntarily committed individuals for services under" the Mental Health Act. We disagree.

The Tort Claims Act vests jurisdiction in the Industrial Commission to hear and decide "tort claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State." N.C.G.S. § 143-291 (2023). "In a Tort Claims Act case, the [Industrial] Commission's duty in addressing a summary judgment motion is limited to determining the existence of genuine issues of material fact and stops short of resolving such issues without an evidentiary hearing." *Norman v. N.C. Dep't of Transp.*, 161 N.C. App. 211,

216 (2003). "Although issues of negligence are generally not appropriately decided by way of summary judgment, if there are no genuine issues of material fact, and an essential element of a negligence claim cannot be established, summary judgment is proper." *Norris v. Zambito*, 135 N.C. App. 288, 293 (1999). Summary judgment is also proper where the movant shows "the opposing party . . . cannot surmount an affirmative defense which would bar the claim." *Smith v. Phillips*, 117 N.C. App. 378, 381 (1994).

In its motion for summary judgment, NCDHHS asserted the doctrine of sovereign immunity as a bar to Plaintiff's claim. Generally, "[u]nder the doctrine of sovereign immunity, the State is immune from suit absent waiver of immunity." *Meyer v. Walls*, 347 N.C. 97, 104 (1997). "[B]y enacting the State Tort Claims Act, [however,] the State 'partially waived its sovereign immunity by consenting to direct suits brought as a result of negligent acts committed by its employees in the course of their employment.'" *Cedarbrook Residential Ctr., Inc. v. N.C. Dep't of Health & Hum. Servs.*, 383 N.C. 31, 45 (2022) (quoting *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 329 (1982)). In the same vein, the State partially waived its sovereign immunity from suits brought against it for the negligent acts committed by the State's agents acting within the scope of their agency:

> The Industrial Commission shall determine whether or not each individual claim arose as a result of the negligence of any officer, employee, involuntary servant or agent of the State while acting within the scope of his office, employment, service, agency or authority, under

circumstances where the State of North Carolina, if a private person, would be liable to the claimant in accordance with the laws of North Carolina.

N.C.G.S. § 143-291 (emphasis added). As such, to determine whether NCDHHS waived its sovereign immunity pursuant to the Tort Claims Act, we must first determine whether Deputy Mitchell was acting as an agent of the State and within the scope of his agency at the time of the fatal accident. *See id.* "[S]ince the Tort Claims Act is in derogation of sovereign immunity it must be strictly construed and the terms must be strictly adhered to." *Etheridge v. Graham*, 14 N.C. App. 551, 553–54 (1972); *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 537–38 (1983) ("Waiver of sovereign immunity may not be lightly inferred and State statutes waiving this immunity, being in derogation of the sovereign right to immunity, must be strictly construed.").

We begin our analysis noting that "[t]he legislature has not defined the term 'agent' in the Tort Claims Act." *Medley v. N.C. Dep't of Correction*, 330 N.C. 837, 840 (1992). Acknowledging this, Plaintiff asserts that counties act as agents of NCDHHS assisting in the administration of a statewide program like the Mental Health Act. To support her proposition, Plaintiff relies on *Stephenson v. Bartlett*, 355 N.C. 354 (2002), where our Supreme Court stated that "[c]ounties serve as the State's agents in administering statewide programs, while also functioning as local governments that devise rules and provide essential services to their citizens." *Id.* at 365. In *Stephenson*, which is a redistricting case, our Supreme Court generally discussed the

counties' historical role in legislative redistricting and their importance as "political subdivisions of the State of North Carolina." *Id.* at 364. When reviewing the legislature's control over counties, the *Stephenson* Court noted how counties "are creatures of the General Assembly and serve as agents and instrumentalities of State government[,]" that play a vital role in "carrying out the general policy of the [S]tate in the administration of government." *Id.* at 364, 366 (citations omitted). The *Stephenson* Court, however, did not consider whether counties were considered agents of the State, within the meaning of the Tort Claims Act, in their administration of all statewide programs. *Id.* at 358.

Whether the State is liable for the negligent acts of a county with respect to administration of statewide policies so "as to confer jurisdiction on the Industrial Commission to hear and decide the merits of this claim pursuant to the provisions of the Tort Claims Act[,]" *Gammons v. N.C. Dep't of Hum. Res.*, 344 N.C. 51, 54 (1996), "depends upon application of the principles of agency and respondeat superior to the facts in the case under consideration[,]" *Vaughn v. N.C. Dep't of Hum. Res.*, 296 N.C. 683, 692 (1979); *see also Barney v. N.C. State Highway Comm'n*, 282 N.C. 278, 284 (1972) ("Under the Tort Claims Act negligence, contributory negligence and proximate cause, as well as the applicability of the doctrine of respondeat superior, are to be determined under the same rules as those applicable to litigation between private individuals."). The general principles of agency and respondeat superior have been summarized as follows:

> Whenever the principal retains the right to control and direct the manner in which the details of the work are to be executed by his agent, the doctrine of respondeat superior operates to make the principal vicariously liable for the tortious acts committed by the agent within the scope of his employment. Conversely, a principal is not vicariously liable for the tortious acts of an agent who is not subject to the control and direction of the principal with respect to the details of the work and is subordinate only in [e]ffecting a result in accordance with the principal's wishes. In sum, a principal's vicarious liability for the torts of his agent depends on the degree of control retained by the principal over the details of the work as it is being performed. The controlling principle is that vicarious liability arises from the right of supervision and control.

*Vaughn*, 296 N.C. at 686 (internal quotation marks and citations omitted).

Our Supreme Court has applied these general principles in *Vaughn* and in *Gammons* to determine whether the State Department of Human Resources ("DHR")—the predecessor of NCDHHS—was vicariously liable as the principal for the acts of a county department of social services ("DSS") as an agent.

In *Vaughn*, the claimant filed a claim under the Tort Claims Act against DHR, alleging that the Durham County Director of DSS and his staff had acted negligently in their delivery of foster care services. 296 N.C. at 685. DHR moved to dismiss the claim for want of jurisdiction, arguing the County Director was not a State employee. *Id.* at 684. The Court analyzed the statutory scheme and the administrative regulations for the delivery of foster care services, and concluded the following factors indicated DHR exercised a substantial amount of control over the County Director: (1) the Social Service Commission, which has the statutory authority to promulgate

rules regarding placement of children in foster homes, enacted comprehensive standards that the County Director was mandated to follow; (2) the Social Service Commission's "mandatory standards on foster care instruct[ed] the County Director of Social Services on virtually all aspects of foster care"; (3) the State provided a substantial amount of funding; (4) the County Director was required to submit semi-annual reports to DHR; and, importantly, (5) the statutory language provided that "the County Director of Social Services is '[t]o act as Agent of the Social Services Commission in relation to Work required by the Social Services Commission in the county.'" *Id.* at 687–90. After considering these factors, the Court concluded that, "in defining the duties of the County Director of Social Services[,] the General Assembly envisaged that he would be the agent responsible for executing whatever work was required by the Social Services Commission in his county." *Id.* at 690. As such, the Court held,

> [t]his statutory scheme gives the [DHR], through the Social Services Commission, control over the delivery of foster care services and designates the County Director as the person responsible for carrying out the policies formulated by the [DHR]. Thus, in practice, as well as in name, the role of the County Director in the delivery of foster care services is that of an agent. Like the agent, the County Director acts on behalf of the [DHR] and is subject to its control with respect to the actions he takes on its behalf.

*Id.* The Court, however, limited its holding, stating that "[i]n every instance the liability of the [DHR] depends upon application of the principles of agency and respondeat superior to the facts in the case under consideration." *Id.* at 692.

- 11 -

Similarly, in *Gammons*, our Supreme Court held DHR could be vicariously liable for the negligent acts of a county DSS with respect to the delivery of child protective services. 344 N.C. at 56. In reaching its holding, the Court utilized the same legal analysis as the *Vaughn* Court and determined the statutory scheme, mandatory administrative regulations, and written comprehensive guidelines clearly demonstrated that "the General Assembly envisaged that [the County Director of Social Services] would be the agent responsible for executing whatever work was required by the Social Services Commission in his county." *Id.* at 62. The Court concluded there was a sufficient agency relationship between DHR and the County Director of Social Services and thus held DHR could be vicariously liable under the Tort Claims Act for the County Director's negligent actions regarding the delivery of child protective services. *Id.* at 63.

Thus, as *Vaughn* and *Gammons* instruct, we must analyze "in detail the statutory scheme and administrative regulations" and apply the general "principles of agency and respondeat superior to the facts in th[is] case" to determine whether the State, through NCDHHS, is liable for the negligent acts of MCSD and its deputies with respect to the transportation of involuntarily committed respondents. *See Vaughn*, 296 N.C. at 692; *see also Gammons*, 344 N.C. at 54. As such, we now turn to "analyze[] in detail the statutory scheme and administrative regulations" for the transportation of involuntarily committed respondents. *See Gammons*, 344 N.C. at 56.

We begin with the statutory scheme of the Mental Health Act. The Mental Health Act, as codified in Chapter 122C of the North Carolina General Statutes, was established to "assist individuals with needs for mental health, developmental disabilities, and substance abuse services in ways consistent with the dignity, rights, and responsibilities of all North Carolina citizens." N.C.G.S. § 122C-2 (2023). To achieve the policy of the State, "State and local governments shall develop and maintain a unified system of services centered in area authorities or county programs" and "shall ensure that the following core services are available: (1) [s]creening, assessment, and referral[;] (2) [e]mergency services[;] (3) [s]ervice coordination[; and] (4) [c]onsultation, prevention, and education." *Id.*

Under the Mental Health Act, the Secretary of NCDHHS is required to enforce the rules promulgated by the Mental Health Commission. N.C.G.S. § 122C-111 (2023). The Mental Health Commission has the vested authority "to adopt, amend and repeal rules to be followed in the conduct of State and local mental health, developmental disabilities, substance abuse programs including education, prevention, intervention, screening, assessment, referral, detoxification, treatment, rehabilitation, continuing care, emergency services, case management, and other related services." N.C.G.S. § 143B-147 (2023). Further, N.C.G.S. § 143B-147 authorizes the Mental Health Commission

> (1) [t]o adopt rules regarding the
>> a. Admission, including the designation of regions,

treatment, and professional care of individuals admitted to a facility operated under the authority of [N.C.]G.S. [§] 122C-181(a), that is now or may be established;

b. Operation of education, prevention, intervention, treatment, rehabilitation and other related services as provided by area mental health, developmental disabilities, and substance abuse authorities, county programs, and all providers of public services under Part 4 of Article 4 of Chapter 122C of the General Statutes;

c. Hearings and appeals of area mental health, developmental disabilities, and substance abuse authorities as provided for in Part 4 of Article 4 of Chapter 122C of the General Statutes; and

. . . .

f. Standards of public services for mental health, developmental disabilities, and substance abuse services.

. . . .

(7) Except where rule making authority is assigned under that Article to the Secretary of the Department of Health and Human Services, to adopt rules to implement Article 3 of Chapter 122C of the General Statutes.

N.C.G.S. § 143B-147. The statute, however, is silent as to whether the Mental Health Commission is authorized to adopt rules relating to the transportation of respondents who have been involuntarily committed under the Mental Health Act.

This is likely because, under N.C.G.S. § 122C-251, the counties are given authority to determine the details of transportation. Despite a few exceptions, the counties are responsible for the transportation between counties of a respondent who

has been involuntarily committed under the Act. *See* N.C.G.S § 122C-251(b) (2023). Which county is responsible for transportation between counties depends on the reason the respondent is being transported: if the respondent is being transported "for a first examination as described in [N.C.]G.S. [§] 122C-263(a) and [N.C.]G.S. [§] 122C-283(a) [or] for admission to a 24-hour facility[,]" the county where the respondent is taken into custody shall provide transportation; if the respondent is being transported because he requested a change of venue for the district court hearing, the "county where the petition for involuntary commitment was initiated" must provide transportation; but, importantly here, if the respondent is being transported after discharge from a facility, "the county of residence of the respondent" must provide transportation, or the "respondent being discharged from a facility may use his own transportation at his own expense." N.C.G.S. § 122C-251(b).

Generally, the cities and counties must "retain and be required to perform the responsibilities set forth in this Article[;]" however, an exception to this general rule is where the plan that was "developed, agreed upon, and adopted in compliance with" N.C.G.S. § 122C-215(g) provides otherwise. N.C.G.S. § 122C-251(g)(4) (2023). Under N.C.G.S. § 122C-215(g), "[t]he governing body of a city or county" is required to "adopt a plan known as an 'involuntary commitment transportation agreement' or 'transportation agreement' for the custody and transportation of respondents in involuntary commitment proceedings[.]" N.C.G.S. § 1222C-251(g). While "[l]aw enforcement and other affected agencies" must "participate in developing the

transportation agreement[,]" N.C.G.S. § 122C-251(g)(1), the governing body maintains the discretionary authority to "designate law enforcement officers, volunteers, or other public or private personnel who have agreed pursuant to subsection (g) of [N.C.G.S. § 122C-251] to provide all or parts of the custody and transportation required by involuntary commitment proceedings[,]" N.C.G.S. § 122C-251(g)(2) (2023). Regardless of whom the county designates, the designated person or agency must comply with Article 5 of the Mental Health Act, which provides:

> Any person or agency designated or required to provide all or parts of the custody and transportation required by involuntary commitment proceedings shall follow the procedures in this Article. References in this Article to a law enforcement officer apply to any person or entity designated to provide custody or transportation. The transportation agreement may provide that private personnel or agencies may contract for transportation services to transport respondents under involuntary commitment from one entity to another.

*Id.* In other words, the statute does not require a "law enforcement officer[,]" which is defined as a "[s]heriff, deputy sheriff, police officer, State highway patrolman, or an officer employed by a city or county under [N.C.]G.S. [§] 122C-302[,]" N.C.G.S. § 122C-3(19) (2023), to transport an involuntarily committed respondent who has been discharged back to their county. Rather, the statute authorizes the local governing body to designate a person or agency to transport involuntarily committed respondents. But even if the governing body has designated a law enforcement officer to transport "a respondent being discharged from a facility[,]" that respondent "may

[nonetheless] use his own transportation at his own expense." *See* N.C.G.S. § 122C-251(b).

While the governing body may designate law enforcement officers to provide transportation, such designated law enforcement officers are directed by statute, "[t]o the extent feasible . . . dress in plain clothes and shall travel in unmarked vehicles[,]" and "to the extent possible, shall advise respondents when taking them into custody that they are not under arrest and have not committed a crime, but are being taken into custody and transported to receive treatment and for their own safety and that of others." N.C.G.S. § 122C-251(c) (2023). Yet, the local governing body also has the power to determine the type of vehicle in which to transport the respondent. *See* N.C.G.S. § 122C-251(c) ("Transportation of a respondent may be (i) by city- or county-owned vehicles, (ii) by private vehicle by contract with the city or county, or (iii) as provided in an agreement developed and adopted under [N.C.G.S. § 122C-251(g)] and [N.C.]G.S. [§] 122C-202.2."). Lastly, the plain language places the responsibility of the cost and expenses of custody and transportation of a respondent, not on NCDHHS, but on the "the county of residence of the respondent." *See* N.C.G.S. § 122C-251(h) (2023). If the State were to provide transportation as permitted under N.C.G.S. § 122C-408(b) (providing special provisions for the Town of Butner), the State is entitled "to recover the reasonable cost of transportation from the county of residence of the respondent." *Id.* (emphasis added).

Our review of the statutory scheme of the Mental Health Act indicates that,

unlike *Vaughn* and *Gammons*, the county—not the Mental Health Commission, nor NCDHHS—has the authority to control and direct the manner in which involuntarily committed respondents are transported by designating any person or agency to transport involuntarily committed individuals, adopting an 'involuntary commitment transportation agreement[,]" and funding of the transportation of involuntarily committed individuals. As such, we are not convinced that the legislature bestowed upon NCDHHS the level of control over "the manner in which the details of the work" necessary to make it vicariously liable for the tortious acts committed by law enforcement officers transporting involuntarily committed respondents. *Cf. Vaughn*, 296 N.C. at 686.

Next, we must analyze any enacted administrative guidelines for the transportation of involuntarily committed respondents to determine whether NCDHHS "retains a right of control over the manner in which [transportation of involuntarily committed respondents] are provided by a local agency. *See Gammons*, 344 N.C. at 60. Plaintiff, however, does not point to—and our research does not reveal—any regulations or manuals promulgated by NCDHHS that supplement the statutes in this area.[2] Rather, Plaintiff directs our attention to a document called

---

[2] We note that the Mental Health Commission did adopt a rule stating that "[t]he governing body responsible for each facility or service shall develop and implement written policies for . . . transportation, including the accessibility of emergency information for a client[.]" 10A NCAC 27G.0201 (December 2025). This rule, however, was not in effect when the Full Commission entered its order.

"Commitment Issues for Law Enforcement" prepared by the North Carolina Department of Justice. But this document was "designed as a reference guide only[,]" and, while it does state the applicable law, it also recommends "that agencies develop a written departmental policy for how to handle the various issues that arise during the course of involuntary commitment proceedings." Interestingly, this reference guide does provide some considerations that may explain why the legislature recommends law enforcement officers wear plain clothes and drive unmarked vehicles:

> It is important to remember that individuals taken into custody under the involuntary commitment statutes have not committed a criminal offense. Law enforcement officers, to the extent possible, shall advise respondents when taking them into custody that they are not under arrest, but are being transported to receive treatment and for their own safety and for the safety of others. N.C.G.S. §122C-251(c).
>
> Because the involuntary commitment process can be frightening and disorienting to the respondent, the law enforcement officer should make every effort to assure the respondent that he or she is there to help. The statute also says that, to the extent feasible, the transporting officer should be in plain clothes and travel in an unmarked vehicle. In addition, if the transporting officer is not of the same sex as the respondent, then an attendant of the same sex should accompany the law enforcement officer during transport. There is no requirement that this attendant be a sworn law enforcement officer. It may be appropriate to allow a member of the respondent's family to accompany the respondent during transport.

Nevertheless, the reference guide does not indicate that NCDHHS "retains the

right to control and direct the manner in which the details of the work are to be executed" by the counties or law enforcement in the transportation of involuntarily committed respondents. *See Vaughn*, 296 N.C. at 686. Therefore, we hold the MCSD is not an agent for NCDHHS when transporting respondents who have been involuntarily committed under the Mental Health Act; consequently, NCDHHS is not vicariously liable for Deputy Mitchell's negligence under the Tort Claims Act.

## B. Nondelegable Duty

Plaintiff also argues that NCDHHS had a nondelegable duty to provide for Mr. Baggott's safe transportation.

Generally, an employer will not be held vicariously liable for the torts of an independent contractor. *Hendricks v. Leslie Fay, Inc.*, 273 N.C. 59, 62 (1968). "The nondelegable duty theory[, however,] is an exception to the rule of nonliability by a principal for the work of independent contractors." *Medley*, 330 N.C. at 841. "Imposition of this nondelegable duty of safety reflects 'the policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them.'" *Woodson v. Rowland*, 329 N.C. 330, 352 (1991) (quoting C. Daye and M. Morris, North Carolina Law of Torts, § 23.31, at 393 (1991)). "Where a principal has a nondelegable duty, one with whom the principal contracts to perform that duty is as a matter of law an agent for purposes of applying the doctrine of respondeat superior." *Medley*, 330 N.C. at 845.

In *Medley*, our Supreme Court considered whether an inmate could sue the

State Department of Correction under the Tort Claims Act for an injury caused by the medical negligence of a private physician who was acting as an independent contractor for a State prison. *Id.* at 838. The Department of Correction moved to dismiss the plaintiff's claim, arguing that, at the time of the injury, the physician was not acting as an employee or agent within the meaning of the Tort Claims Act. *Id.* Our Supreme Court held that, regardless of whether the physician was an employee or an independent contractor, the physician, as a matter of law, was acting as an agent of the State because he was performing the State's nondelegable duty of providing adequate medical care to inmates. *Id.* at 839.

Here, however, the nondelegable duty theory is not appliable for three reasons. First, N.C.G.S. § 122C-251 places the duty of transportation of an involuntarily committed respondent on the county—or, in some instances, the city—but not the State. *See* N.C.G.S. § 122C-251(b) ("Transportation between counties under the involuntary commitment proceedings of this Article for discharge of a respondent from a 24-hour facility *shall* be provided by the county of residence of the respondent." (emphasis added)); *see also Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 863 (2018) ("As used in statutes, the word 'shall' is generally imperative or mandatory." (citation omitted)).

Second, the plain language of N.C.G.S. § 122C-251 also indicates that the duty to transport involuntarily committed individuals is a delegable duty. Specifically, under subsection (g), counties are permitted to create a transportation agreement

that allows "private personnel or agencies [to] contract for transportation services to transport respondents under involuntary commitment from one entity to another." N.C.G.S. § 122C-251(g)(2). Further, the county must "retain and be required to perform the responsibilities set forth in this Article, *except as set forth in a plan developed, agreed upon, and adopted in compliance with this subsection.*" N.C.G.S. § 122C-251(g)(4) (emphasis added).

Third, even if the State had a duty to provide transportation for involuntarily committed respondents, here, there is only evidence of Macon County contracting with Western Carolina Public Safety, LLC d/b/a/ Sheriffs Transport Service for the provision of non-emergency transportation. In other words, there is no evidence that the State specifically delegated this assumed duty to MCSD. *Cf. Medley*, 330 N.C. at 845 ("Where a principal has a nondelegable duty, one with whom the principal *contracts* to perform that duty is as a matter of law an agent for purposes of applying the doctrine of respondeat superior." (emphasis added)). As such, Plaintiff has failed to show NCDHHS had a nondelegable duty to transport Mr. Baggott.

In sum, Plaintiff has not shown that Deputy Mitchell was acting as an agent for NCDHHS at the time of the fatal accident. Plaintiff's claim under the Tort Claims Act is therefore barred by the doctrine of sovereign immunity. *See Meyer*, 347 N.C. at 104. As such, the Full Commission did not err by granting Defendant's motion for summary judgment and dismissing Plaintiff's claim based on the defense of sovereign immunity. *See Smith*, 117 N.C. App. at 381.

Having concluded the Full Commission did not err in granting Defendant's motion for summary judgment, we need not address Plaintiff's second argument that the Full Commission erred by failing to award summary judgment in Plaintiff's favor. Since Plaintiff's claim is barred by the doctrine of sovereign immunity, the Full Commission properly granted Defendant's motion for summary judgment and dismissed Plaintiff's claim. *See id.*

## V. <u>Conclusion</u>

Upon careful review, we conclude the Full Commission properly granted summary judgment for NCDHHS with respect to Plaintiff's claim under the Tort Claims Act, where Plaintiff's claim was barred by sovereign immunity. Therefore, the Full Commission's order granting summary judgment for NCDHHS is affirmed.

AFFRIMED.

Judges ZACHARY and STADING concur.